IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JONIBACH MANAGEMENT TRUST, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION H-10-600 |
| | § | |
| WARTBURG ENTERPRISES, INC., | § | |
| | § | |
| Defendant. | § | |

## OPINION AND ORDER

Pending before the Court in the above referenced cause, in which the sole remaining issue is a counterclaim filed by Defendant Wartburg Enterprises, Inc. ("Wartburg") against Plaintiff Jonibach Management Trust, a South African company trading as Bumbo International Trust, ("Bumbo"), alleging breach of an oral agreement between the two parties for Wartburg to distribute to retailers in the United States plastic baby seats products sold to Wartburg by Bumbo, is Bumbo's second motion for summary judgment (instrument #152).

### Standard of Review

Summary judgment under Federal Rule of Civil Procedure 56(c) is appropriate when, viewing the evidence in the light most favorable to the nonmovant, the court determines that "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, show that there is no

-1-

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  A dispute of material fact is "genuine" if the evidence would allow a reasonable jury to find in favor of the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Where the nonmovant bears the burden of proof on a claim at trial, the movant must offer evidence that undermines the nonmovant's claim or point out the absence of evidence supporting essential elements of the nonmovant's claim; the movant may, but does not have to, negate the elements of the nonmovant's case to prevail on summary judgment." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Lujan v. National Wildlife Federation*, 497 U.S. 871, 885 (1990); *Edwards v. Your Credit, Inc.*, 148 F.3d 427, 431 (5th Cir. 1998).

If the movant meets its burden, the nonmovant must then present competent summary judgment evidence to support the essential elements of its claim and to demonstrate that there is a genuine issue of material fact for trial. *National Ass'n of Gov't Employees v. City Pub. Serv. Board*, 40 F.3d 698, 712 (5th Cir. 1994).  "[A] complete failure of proof concerning an essential element of the nonmoving party's case renders all other facts immaterial." *Celotex*, 477 U.S. at 323.  The nonmovant may not rely merely on allegations, denials in a pleading or unsubstantiated assertions that a fact issue exists, but must set forth specific

facts showing the existence of a genuine issue of material fact concerning every element of its cause(s) of action. *Morris v. Covan World Wide Moving, Inc,*, 144 F.3d 377, 380 (5th Cir. 1998).

Conclusory allegations unsupported by evidence will not preclude summary judgment. *National Ass'n of Gov't Employees v. City Pub. Serv. Board*, 40 F.3d at 713; *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996). "'[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . .'" *State Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 118 (5th Cir. 1990), *quoting Anderson v. Liberty Lobby, Inc.*. 477 U.S. 242, 247-48 (1986). "Nor is the 'mere scintilla of evidence' sufficient; 'there must be evidence on which the jury could reasonably find for the plaintiff.'" *Id., quoting Liberty Lobby*, 477 U.S. at 252. The Fifth Circuit requires the nonmovant to submit "'significant probative evidence.'" *Id.*, *quoting In re Municipal Bond Reporting Antitrust Litig.*, 672 F.2d 436, 440 (5th Cir. 1978), and *citing Fischbach & Moore, Inc. v. Cajun Electric Power Co-Op.*, 799 F.2d 194, 197 (5th Cir. 1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Thomas v. Barton Lodge II, Ltd.*, 174 F.3d 636, 644 (5th Cir. 1999), *citing Celotex*, 477 U.S. at 322, and *Liberty Lobby*, 477 U.S. at 249-50.

Allegations in a plaintiff's complaint are not evidence.

-3-

*Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996)("[P]leadings are not summary judgment evidence."); *Johnston v. City of Houston, Tex.,* 14 F.3d 1056, 1060 (5th Cir. 1995)(for the party opposing the motion for summary judgment, "only evidence--not argument, not facts in the complaint--will satisfy' the burden."), *citing Solo Serve Corp. v. Westown Assoc.*, 929 F.2d 160, 164 (5th Cir. 1991).  The nonmovant must "go beyond the pleadings and by [his] own affidavits, or by depositions, answers to interrogatories and admissions on file, designate specific facts showing that there is a genuine issue of material fact for trial." *Giles v. General Elec. Co.*, 245 F.3d 474, 493 (5th Cir. 2001), *citing Celotex*, 477 U.S. at 324.

The court must consider all evidence and draw all inferences from the factual record in the light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *National Ass'n of Gov't Employees v. City Pub. Serv. Board*, 40 F.3d at 712-13.  The Court may not make credibility determinations nor weigh evidence. *Deville v. Marcantel*, 567 F.3d 156, 164 (5th Cir. 2009), *citing Turner v. Baylor Richardson Medical Center*, 476 F.3d 337, 343 (5th Cir. 2007).

## Procedural History

From 2003-2010, Wartburg, *inter alia*, distributed to various retailers in the United States baby seats manufactured in South Africa, purchased by Bumbo, and resold to Wartburg.  Since 2008

Wartburg also served as Bumbo's distributor for Wal-Mart, Toys "R" Us, and Babies "R" Us, Bumbo's largest retailers and most important American clients.   The relationship between Wartburg and Bumbo deteriorated over time as Wartburg failed to make timely payments for products sent to it by Bumbo on credit.   Bumbo decided to hire another distributor, but Wartburg objected, refused to distribute its Bumbo products to Wal-Mart, Toys "R" Us, and Babies "R" Us, and demanded to be Bumbo's exclusive distributor in this country.

On February 25, 2010, Bumbo filed this suit alleging breach of the distribution agreement and seeking specific performance, and the next day moved for a preliminary injunction (#3), which was granted (#8).[1]   In granting the preliminary injunction requiring Wartburg to distribute its supply of Bumbo baby seats to the three major retailers allegedly pursuant to the parties' oral agreement and to post a $2000 bond, this Court found that "the clear course of dealing over several years" between the parties "strongly suggests an enforceable oral agreement." #8 at p. 3.   On March 12,

_____

[1] Because Bumbo is a South African company, it could not ship replacements timely to avoid inventory shortfalls at these three important clients and therefore filed for injunctive relief to prevent Wartburg from selling its Bumbo products to anyone other than these three retailers.   In support of its motion for injunctive relief, Bumbo presented evidence that Wartburg's primary responsibility under the oral agreement was to "ensure that the inventory needs of these three retailers were being met."   #3-1, Gerhard Wagenaar's Declaration, with copies of letters from Mark Buchanan, Wartburg's Vice President, attached as exhibits demonstrating animosity; #3-2, Christo Wagenaar's Declaration.

2010, Wartburg filed counterclaims against Bumbo for breach of contract, fraud, and quantum meruit, amended on April 5, 2010. #15, 31.

On June 18, 2010 Bumbo moved to dismiss all its own claims against Wartburg and to lift the temporary injunction (#41) because Bumbo had found another distributor with adequate stock to meet the requirements of its United States retailers for the baby products and because Wartburg had informed Bumbo that its stock of Bumbo baby products was completely depleted, in other words because "the circumstances which prompted this lawsuit and necessitated the injunction have . . . been resolved." #41 at p.1. On February 16, 2011 the Court granted with prejudice Bump's motion to dismiss its own claims, to lift the preliminary injunction, and to return to Bumbo the $2000 bond it had posted (#86), thus leaving only Wartburg's counterclaims against Bumbo to be resolved.

The next day, February 17, 2011, the Court granted Bumbo's motion to dismiss (#23) Wartburg's counterclaims for fraud and quantum meruit for failure to state a claim, but denied it as to Wartburg's counterclaims for breach of contract (#87). Wartburg alleged three ways in which Bumbo had breached the parties' agreement: (1) by "refusing to sell and/or provide its baby products to Wartburg for sale to Wartburg's customers" (the "refusal of sale claim"); (2) by "taking over Wartburg's customer relationships" (the "customer relationships claim"); and (3) by

"demand[ing] that Wartburg sell its inventory only to certain retailers," i.e., to Wal-Mart, Toys "R" Us, and Babies "R" Us (the "retailer limitation claim").   #145 at p. 3.   For clarity, the Court refers to them as separate claims since they were resolved differently.

On September 7, 2012, in ruling on Bumbo's first motion for summary judgment on the breach-of-contract counterclaims (#107), this Court held that the statute of frauds barred Wartburg's attempt to enforce the parties' alleged oral distributorship agreement and granted final summary judgment (#129 and 130) in favor of Bumbo on all three of Wartburg's breach-of-contract counterclaims.   Citing the Texas statute of frauds, Texas Business & Commerce Code § 2.201(a)("[A] contract for the sale of goods for the price of $500 or more is not enforceable . . . unless there is some writing sufficient to indicate that a contract for sale had been made between the parties and signed by the party against whom enforcement is sought."), and *Hugh Symons, plc v. Motorola, Inc.*, 292 F.3d 466, 469 (5th Cir. 2001)[, *cert. denied*, 537 U.S. 950 (2002)],[2] and changing its mind since entering the preliminary

---

[2] In *Hugh Symons Group*, 292 F.3d at 469, the Fifth Circuit panel opined,

> The Texas statute of frauds requires a writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought for the sale of any goods for the price of $500 or more.   The lack of such a writing bars enforcement of the alleged oral

injunction,[3] this Court decided that all three breach-of-contract counterclaims arose "not as a result of any initial oral agreement between the parties, but out of an alleged later oral modification" of the initial agreement (i.e., allegedly that Wartburg would have exclusive distributorship rights for Bumbo's baby seats in the United States in return for Wartburg's representing Bumbo in a recall of its baby seats beginning in October 2007 by the Consumer Products Safety Commission and for handling product issues in the United States regarding Toys "R" Us, Babies "R" Us, Wal-Mart, and Target). Opinion and Order granting Bumbo's first motion for summary judgment, #129 at p.2; #145 at p.3. This Court granted summary judgment to Bumbo because Wartburg failed to introduce any evidence of a written agreement as to any modification of the prior agreement, and thus claims based on the modification were barred by

---

contract. *See* Tex. Bus. & Co. Code § 2.201(a). Where a plaintiff seeks to enforce an alleged oral contract, it has the burden of proving that the statute of frauds is satisfied. *Otto Vehle & Reserve Law Officers Assoc. v. Brenner*, 590 S.W. 2d 147, 152 (Tex. Civ. App.--San Antonio 1979, no writ); *Zimmerman v. H.E. Butt Grocery Co.*, 932 F.2d 469, 471 (5th Cir. 1991).

[3] On appeal, the Fifth Circuit points out since "the purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held," the showing for a preliminary injunction is not the same as that for a ruling on the merits, and "the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits." #145 at p.8 (also available at 750 F.3d 486, 491 (5th Cir. 2014)), *citing Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). *See also Meineke Discount Muffler v. Jaynes*, 999 F.2d 120, 122 n.3 (5th Cir. 1993).

the statute of frauds.

On appeal of this Court's summary judgment, the Fifth Circuit affirmed that portion of the Court's order granting Bumbo summary judgment on the first two counterclaims (the refusal of sale and the customer relationships counterclaims), agreeing with this Court that the two were "rooted in a later oral modification relating to the exclusive distribution," that "[t]here was no written evidence of this modification," and that this "modification does not fall into any of the exceptions to the statute of frauds." #145 at p. 6; also available at *Jonibach Management Trust v. Wartburg Enterprises, Inc.*, 750 F.3d 486, 490 (5th Cir. 2014).

With regard to Wartburg's retailer-limitation counterclaim (that Bumbo breached the parties' agreement by demanding that Wartburg sell its inventory only to Wal-Mart, Toys "R" Us, and Babies "R" Us), however, the appellate court concluded that this claim arose not from the oral modification of the original distributorship agreement (to be the exclusive distributor for Bumbo products in the United States), but from the original oral distribution agreement on which the permanent injunction was based (that Bumbo breached the agreement by "demand[ing] that Wartburg only sell its inventory to Walmart, Toys "R" Us, and Babies "R" Us."[4] #145 at p.7; *Jonibach*, 750 F.3d at 490-91. Furthermore, the

---

[4] Wartburg contended that the parties did not agree that Wartburg must supply only these three.  Moreover Bumbo's motion for injunctive relief sought a TRO "preventing Wal-Mart from

Fifth Circuit panel focused on exceptions to the Texas statute of frauds in Texas Business & Commerce Code Ann. § 2.201(c)(2) and (3), that an unwritten contract is enforceable if it "is valid in other respects . . . with respect to goods for which payment has been made and accepted or which have been received and accepted" and/or "if the party against whom enforcement is sought admits in his pleading, testimony or otherwise in court that a contract for sale was made," although the panel noted that such "contract is not enforceable . . . beyond the quantity of goods admitted." #145 at p.6; *Jonibach*, 750 F.3d at 491-92. Because Wartburg had received and accepted the goods and because Bumbo repeatedly asserted in court that there was an initial agreement, the Fifth Circuit determined that the agreement falls under the exceptions to the statute of frauds in § 2.201(c)(2) and (3), and because its pleadings and testimony regarding the initial agreement are judicial admissions, that an agreement existed, the Fifth Circuit

---

selling or otherwise disposing of Bumbo products to anyone other than Wal-Mart, Toys "R" Us, and Babies "R" Us and a preliminary injunction "mandating that Wartburg distribute Bumbo products it has in stock to Wal-Mart and Toys 'R' Us, as it is supposed to." [Toys "R" Us, and Babies "R" Us merged, explaining why only one is named here.] The Fifth Circuit also highlighted the testimony of Wartburg's Vice President, Mark Buchanan, that Bumbo's demand that "Wartburg only sell its inventory to certain retailers, Wal-Mart, Toys "R" Us, and Babies "R" Us to the exclusion of Wartburg's other customers," related only to the injunction. #145 at p. 7. The Fifth Circuit concluded, "Wartburg's claim alleging that the parties *did not* agree that it must supply these retailers is clearly rooted in the same agreement as Bumbo's earlier claim that they *did* agree to the limitation." #145 at p. 7.

opined that this Court had erred in dismissing the retailer-limitation counterclaim as barred by the statute of frauds. Moreover, the Fifth Circuit further held that this initial distributorship agreement was not enforceable "beyond the quantity of goods admitted," i.e., it was enforceable "only as to the goods that were the subject of the preliminary injunction."  #145 at p. 9, quoting § 2.201(c)(2); *Jonibach*, 750 F.3d at 491–92.  The Fifth Circuit remanded the retailer-limitation claim to this Court to determine whether there was any genuine issue of material fact regarding it and for further proceedings consistent with its opinion.  *Id.; id.*

In addition, the Fifth Circuit emphasized that the findings of fact and conclusions of law made to support the issuance of the preliminary injunction were not binding in a subsequent trial on the merits and that "a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits [#145 at p.8]."

### Bumbo's Second Motion for Summary Judgment (#152)

Bumbo maintains that there is no genuine issue of material fact and that it is entitled to summary judgment on the sole remaining counterclaim.

Bumbo characterizes Warburg's retailer-limitation counterclaim as a claim for the wrongful obtainment of a preliminary injunction

-11-

that required Wartburg to supply its inventory of Bumbo seats to Wal-Mart, Toys "R" Us, and Babies "R" Us.[5]  Bumbo points out that on February 16, 2011, when this Court, with Wartburg's agreement, granted Bumbo's motion to dismiss all of Bumbo's claims against Wartburg and to dissolve the preliminary injunction, the Court lifted the preliminary injunction and ordered the $2000 bond posted by Bumbo to be returned to Bumbo (#86).  Bumbo argues that it is black letter law that "[a] party injured by the issuance of an injunction later determined to be erroneous has no action for damages in the absence of a bond."  *W.R. Grace and Co. v. Local Union 759, Intern. Union of United Rubber*, 461 U.S. 757, 770 n.14 (1983), *citing Russell v. Farley*, 105 U.S. 433, 437 (1976),[6] and *Buddy Systems, Inc. v. Exer-Genie, Inc.*, 549 F.2d 1164, 1167-68 (9th Cir. 1976)("It is a well-settled rule that there can be no recovery for damages sustained by a wrongful issuance of preliminary injunction in the absence of a bond."), *cert. denied*, 431 U.S. 903 (1977).  *See also Alpert v. Riley*, 457 Fed. Appx. 429, 430 n. 1 (5th

---

[5] Bumbo relies on the deposition of Wartburg's Vice President, Mark Buchanan (#107-2 at 57:2-18), stating that the retailer-limitation claim relates only to Wartburg's claims that it suffered as the result of the wrongful injunction obtained by Bumbo under the original agreement.

[6] Wartburg asserts that *W.R. Grace and Co.* is inapplicable here because it was not about a wrongful injunction, but instead addressed whether an arbitration award regarding a collective bargaining agreement should be enforced.

Cir. Jan 12, 2012)[7](*quoting W.R. Grace*, 461 U.S. at 770 n.14, that
a "party injured by the issuance of an injunction later determined
to be erroneous has no action for damages in the absence of a
bond").[8]   Thus here, because there is no longer a bond against

---

[7] Wartburg argues that *Alpert* is inapposite because, unlike
here, in it the district court did not require a bond to be
posted when it issued its preliminary injunction, so the
appellant had no wrongful injunction claim.  457 Fed. Appx. at
430 n.1.

[8] This Court observes, and as noted in *Corporate Relocation,
Inc. v. Martin*, No. 3:06-CV-232-L, 2006 WL 4101944, at *19 n.22
(N.D. Tex. Sept. 12, 2006), that despite Rule 65(c)'s direction
that "[n]o . . . preliminary injunction shall issue except upon
the giving of security by the applicant . . . .", and despite
*W.R. Grace*'s holding, since the Supreme Court issued *W.R. Grace*
the Fifth Circuit has issued contradictory opinions about whether
security in the form of a bond must be posted for a claimant to
be able to recover subsequently for a wrongful injunction.  *Id.,
citing cases*.  In a pre-*W.R. Grace* case, *Corrigan Dispatch Co. v.
Casa Guzman, S.A.*, 569 F.2d 300, 303 (5th Cir. 1978), the Fifth
Circuit held that a district court "may elect to require no
security at all."  Since that time, in some cases the Fifth
Circuit has continued to cite *Corrigan* and rely on that precept.
*See, e.g., Humana, Inc. v. Avram A. Jacobson, MD, PA*, 804 F.2d
1390, 1394 & n.23 (5th Cir. 1986); *Kaepa, Inc. v. Achilles Corp.*,
76 F.3d 624, 628 & nn. 18 and 19 (5th Cir. 1996)("The district
court did not violate Rule 65(c) by failing to compel Kaepa to
post a bond."), *cert. denied*, 519 U.S. 821 (1996); *EOG Resources,
Inc. v. Beach*, 54 Fed. Appx. 592, No. 02-60415, 2002 WL 31730385,
at *1 n.2 (5th Cir. Nov. 26, 2002)("in this circuit, however,
courts have the discretion to issue injunctions without
security"); *Smith v. Matthews*, No. 3:13-CV-307, 2010 WL 5197781,
at *3-4 (S.D. Tex. Jan. 20, 2010); *Allied Home Mortg. Corp. v.
Donovan*, 830 F. Supp. 2d 223, 235 (S.D. Tex. 2011)(following
*Corrigan, EOG Resources, and Kaepa*), *vacated and remanded on
other grounds*, ___ Fed. Appx. ___, 2015 WL 4461218 (5th Cir. July
22, 2015).  In other cases it has concluded in accord with *W.R.
Grace* that without a bond there is no action for damages for a
wrongful injunction.  *See, e.g., Phillips v. Chas. Schreiner
Bank*, 894 F.2d 127, 131 (5th Cir. 1990)("[F]ailure to require the
posting of a bond or other security constitutes grounds for

which Wartburg can make a claim, it has no action for damages for the erroneous issuance of the injunction, insists Bumbo.  Bumbo asserts in a footnote, "To the extent that Wartburg tries to argue that this claim is based on anything other than Bumbo's obtaining

reversal of an injunction."); *Continuum Co., Inc. v. Incepts*, 873 F.2d 801, 803 (5th Cir. 1989)("[S]ome courts have waived the security requirement when they have found that the plaintiff is financially responsible or was very likely to succeed on the merits . . . . apparently assum[ing] that, should the plaintiff later lose on the merits, the defendant may recover the damages inflicted by the injunction.  That assumption seems doubtful, however, by the Supreme Court's declaration in *W.R. Grace*.") (*citing Scherr v. Volpe*, 466 F.2d 1027, 1035 (7th Cir. 1972)and *Alpert*, 457 Fed. Appx. at *1 n.1 ("As the district court in this case did not require the Appellees to post a bond when it issued the preliminary injunction, Appellant lacks a wrongful injunction claim.")), *reconsideration granted in part and denied in part*, 883 F.2d 333 (5th Cur. 1989)(appointment of special master to determine plaintiff's economic condition), *on reconsideration*, 901 F.2d 1111 (5th Cir. 1990).  Thus it is not clear as a matter of law whether the Fifth Circuit would bar a wrongful injunction claim where there was no bond pending after the injunction has been lifted.

Furthermore, other courts have questioned the reach of *W.R. Grace* and *Russell v. Farley*, and whether in denying damages a court denies all equitable relief where there is no bond.  *See, e.g., Dornan v. Sheet Metal Workers' Intern. Ass'n*, 810 F. Supp. 856, 859 (E.D. Mich. 1992)("[T]he case does not stand for the proposition that a court cannot grant restitution for an erroneous injunction")(citing cases that have done so).

Moreover, a number of other courts have recognized some discretion in waiving a bond while granting an injunction.  *See, e.g., Crowley v. Local No. 82, Furniture & Piano Moving, Furniture Store Drivers, Helpers, Warehousemen, and Packers*, 679 F.2d 978, 999-1000 ((and cases cited therein, including some requiring no bond in suits for enforce important federal rights or public interests or cases involving indigent plaintiffs), *rev'd on other grounds*, 467 U.S. 526 (1984).   *See also* Erin Connors Morton, *Security for Interlocutory Injunctions Under Rule 65(c): Exceptions to the Rule Gone Awry*, 46 Hastings L. J. 1863 (Aug. 1995); Note, *Recovery for Wrongful Interlocutory Injunctions*, 99 Harvard L. Rev. 828 (Feb. 1986).

-14-

this preliminary injunction, that argument must fail.  Wartburg bears the burden of proof on this issue, so it must be able to point to competent summary judgment evidence in the record to substantiate this allegation."  #152 at p. 6 n.26.

Furthermore, even if the Court does not agree with this argument, Bumbo insists that Wartburg cannot now offer evidence of damages because it did not timely disclose any damages related to its claim that the preliminary injunction was wrongfully obtained. Under Fed. R. Civ. P. 26(a)(1)(A)(iii),[9] initially Wartburg had to disclose a computation of each category of damages that it was claiming, along with documents and materials on which its computation was based.  Under Rule 37(c), if a party fails to disclose this information, it is barred from using it for evidence unless its failure "was substantially justified or is harmless." Wartburg's first disclosure of any damages was on August 1, 2012,

---

[9] Rule 26(a)(1)(A)(iii) states,

Except as exempted by Rule 26(a)(1)B) or as otherwise stipulated or ordered by the court, a party must, without awaiting a discovery request, provide to the other parties . . . a computation of each category of damages claimed by the disclosing party--who must also make available for inspection and copying as under Rule 34 the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based, including materials bearing on the nature and extent of injuries suffered.

Rule 26(a)(1)(C) requires parties to make this disclosure at or within fourteen days of the Rule 26(f)August 21, 2015 discovery planning conference.

when it served its First Supplemental Initial Disclosure (#152, Ex. B at pp. 4-8) of damages related solely to its claim that it was supposed to be the exclusive distributor of Bumbo's products in the United States.  Wartburg also did not disclose timely any damages related to its retailer limitation claim before the discovery deadline of August 15, 2011 (#85).  The first time Wartburg disclosed damages relating specifically to the retailer-limitation counterclaim was on September 4, 2014, after the Fifth Circuit rendered its decision and remanded the case and more than three years after the discovery deadline.  #152, Ex. C at pp. 8-9.  Bumbo maintains that this failure to disclose timely was not harmless because it deprived Bumbo of the opportunity to conduct any discovery related to its current new theory of damages and damage model and to retain experts on the issue.  Moreover Bumbo contends that to reopen discovery now would substantially delay a case already four years old and significantly prejudice Bumbo.  Since damages are an essential element of Wartburg's breach-of-contract retailer-limitation counterclaim, Bumbo argues that it is entitled to summary judgment.

### Wartburg's Response (#153)

Wartburg objects that its remaining retailer-limitation counterclaim is not one for a wrongful preliminary injunction and highlights the fact that this claim arose before the Court issued the preliminary injunction.  Wartburg's appeal raised two issues:

whether the statute of frauds bars a claim for breach of an oral distributorship contract for goods already received and accepted (an exception to the statute of frauds in § 2.201(c)(3)), and whether, once a party sues on an oral contract and obtains a preliminary injunction requiring specific performance, may a party assert, in response to a counterclaim based on the same contract that the contract, unenforceable under the statute of frauds? Wartburg's Appellant Brief, Case 13-20308, #00512364945. There was also no finding by the Fifth Circuit that Wartburg was wrongfully enjoined when the Court ordered it to sell its remaining stock of Bumbo's products only to Wal-Mart, Toys "R" Us, and Babies "R" Us, even though Wartburg had approximately 1,500 other retail customers to which it also sold Bumbo products. Wartburg insists its retailer-limitation counterclaim is based on a breach of the distributorship contract, which Wartburg claims gave it control of who received those products and did not require it to supply the three big retailers to the exclusion of its other clients, not on a wrongful injunction.

Wartburg further challenges Bumbo's argument that it has no claim for damages because there is no posted bond and because Wartburg did not timely disclose its damages. Wartburg contends that even if its claim were one for wrongful injunction, Wartburg

could seek damages outside the bond,[10] and argues that Wartburg did
disclose various theories of damages during this litigation.

According to Wartburg, after Bumbo breached the parties'
agreement by forcing Wartburg to sell its inventory only to Wal-
Mart, Toys "R" Us, and Babies "R" Us by means of the injunction,
and when Wartburg had no more inventory to sell, Bumbo moved to
dismiss its own claims without prejudice as moot and to lift the
injunction.  Warburg objected to a dismissal "without prejudice"
and argued there was no need to withdraw the injunction since
Wartburg had complied with it and because Wartburg had no more
Bumbo products to distribute, i.e., "the injunction expired and
there was nothing left to enjoin."  at pp. 3-4.  On appeal, the
Fifth Circuit observed that the findings of fact and conclusions of
law made to support the issuance of the preliminary injunction were
not binding in a subsequent trial on the merits and that "a
preliminary injunction is customarily granted on the basis of
procedures that are less formal and evidence that is less complete
than in a trial on the merits [#145 at p.8]."  *See* footnote 3 of
this Opinion and Order.  Wartburg thus argues that "it is therefore
axiomatic that Wartburg's breach of contract claim cannot be barred

---

[10] *Citing Continuum*, 873 F.2d at 804 (refusing to increase
the amount of the bond where enjoining party would be able to
satisfy a judgment for damages for wrongful injunction that might
be obtained against it and because of undue hardship on the
enjoining party in having to raise the money for a bond, but
requiring it to file an undertaking waiving the limit on
damages).

based on a preliminary injunction that is not binding at a trial on the merits, and that "the entire premise of Bumbo's efforts to use the preliminary injunction to now deny Wartburg a trial on the merits without any evidence is misplaced." #153 at p. 4.

Moreover Wartburg rejects Bumbo's contention, "To the extent that Wartburg tries to argue that this claim is based on anything other than [Bumbo's] obtaining this preliminary injunction, that argument must fail [because] Wartburg bears the burden of proof on this issue." #152 at p. 6 n.26.  Wartburg insists that Bumbo, as the party seeking summary judgment, bears the burden of showing that there are no genuine issues of material fact for trial.  Fed. R. Civ. P. 56(c).  Wartburg contends that Bumbo has failed to show that Wartburg's claim is one for wrongful injunction.  To prevail on such a claim, one must show (1) the wrongful issuance of the preliminary injunction; (2) the posting of a bond; and (3) resulting damages.  *Buddy Systems, Inc.*, 545 F.2d at 1169 n.10.[11] Wartburg maintains that Bumbo has not and cannot produce any evidence demonstrating the first element, that the injunction was wrongfully issued.  The issues which Wartburg actually appealed were (1) whether the statute of frauds bars the claim for breach of

---

[11] This Court notes that if Wartburg's claim were for wrongful injunction, it, as the enjoined party, not Bumbo, would bear the burden of proving that claim at trial.  *Buddy Systems*, 545 F.2d at 1169 n.10.  Bumbo, as the party moving for summary judgment on that claim, bears the burden of demonstrating there was no genuine issue of material fact regarding it and that Bumbo is entitled to summary judgment as a matter of law.

an oral distributorship contract for goods already received and accepted by the distributor (an exception to the statute of frauds), and (2) after a party sues on an oral contract and obtains a preliminary injunction requiring specific performance, may that party, in response to a counterclaim based on the same contract, argue that the contract is unenforceable under the statute of frauds?  Wartburg's Appellate Brief, Case No. 13-20308, Dkt. #00512364945.  Wartburg emphasizes that the Fifth Circuit made no finding that the preliminary injunction was erroneous and/or wrongful.  Indeed the issue was never raised before this Court or the appellate court.  Moreover, it is illogical to argue that Wartburg is claiming wrongful injunction when the Fifth Circuit opined that the findings from the preliminary injunction are not binding at trial and that Wartburg can now challenge this Court's finding when it issued the preliminary injunction that "the contract contained a limitation on which retailers Wartburg could supply [#145 at p.8]."  Therefore, argues Wartburg, given the remand from the Fifth Circuit, the issues currently before the Court are (1) what were the terms in the contract between Bumbo and Wartburg regarding supplying retailers with the goods that were the subject of the preliminary injunction; (2) to which retailers was Wartburg required to sell the goods, if any, and on what terms; and (3) whether Warburg suffered any damages.  Wartburg insists that because Bumbo's summary judgment evidence does not show that the

preliminary injunction was wrongfully issued, the Court should deny Bumbo's motion for summary judgment.

Even if Wartburg's counterclaim were one for wrongful injunction, and notwithstanding the fact that there has been no finding that the preliminary injunction was wrongfully issued, Bumbo's contention that Wartburg's damages are limited to making a claim on a $2000 bond that no longer exists is incorrect, argues Wartburg.   Citing *Continuum Co.*, 873 F.2d at 803-04,[12] Wartburg

_____

[12] Although Rule 65(c) states, "The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained," in *Continuum Co.* the Fifth Circuit reviewed reasons why courts at times have waived the bond requirement, 873 F.2d at 803-04:

> While a district court's failure to require the posting of a bond or other security constitutes grounds for reversal of injunction, some courts have waived the security requirement when they have found that the plaintiff was financially responsible, or was very likely to succeed on the merits.  Courts that have waived the bond requirement have apparently assumed that, should the plaintiff later lose on the merits, the defendant may recover the damages inflicted by the injunction.  That assumption is rendered doubtful, however, by the Supreme Court's declaration in *W.R. Grace & Co. v. Local Union 759* that "[a] party injured by the issuance of an injunction later determined to be erroneous has no action for damages in the absence of a bond."
>
> Courts that have waived the bond requirement have done so without determining whether the plaintiff should be excused from liability even if it had wrongfully obtained the injunction.  If the plaintiff's claim subsequently proved to be nonmeritorious, the court would be compelled either to follow the rule that restricts liability to the bond amount and thus unjustly deny the defendant compensation, or to

argues that there is authority that recognizes recovery outside the posted bond amount.

Finally, Wartburg maintains that on August 1, 2011 it disclosed several theories of damages on its breach-of-contract claims, including multiple damage models in its First Designation of Experts and First Supplemental Initial Disclosures, including a detailed report from valuation expert David Fuller, copies attached to Bumbo's motion for summary judgment (#152).[13]   Wartburg designated its Vice President, Mark Buchanan, to testify on

---

compensate the defendant, thus defeating the reasonable
expectations of the plaintiff [that the amount of the
bond is the total amount of the damages that the
defendant can obtain for a wrongful injunction] under
Rule 65(c). [footnote citations omitted]

     In *Continuum Co.*, first filed in state court where the
judge issued a temporary injunction conditioned on the posting of
a $200,000 bond by plaintiff, the defendant then filed a
voluntary petition for bankruptcy.  After the automatic stay was
lifted, the defendant removed the case to federal court and moved
for an increase of the bond amount to $5,000,000.  The federal
district court told the plaintiff either to increase the bond
from $200,000 to $2,000,000 or the judge would dissolve the
injunction.  The plaintiff appealed, and the Fifth Circuit found
that Continuum presented evidence that its substantial earnings
would be able to satisfy any judgment for damages that might be
obtained for wrongful injunction, but that posting a $2,000,000
would cause it great hardship.  The appellate court appointed a
special master to determine the plaintiff's financial situation,
and then allowed Continuum to continue its $200,000 bond, but
required it to file an undertaking stating that the amount of the
bond would not limit the damages for which it might become liable
because the injunction had been wrongfully issued.  *Id.* at 804.

[13] Wartburg concedes that on October 24, 2011 the Court
struck Wartburg's damages expert, David N. Fuller, from
testifying, #122.

damages.  Ex. 1, Wartburg's Expert Designation; Damages models, Ex.
B to #152.   The damages models disclose damages caused on an
individual product unit basis and on Bumbo's destruction of
Wartburg's business caused by Bumbo's breaches.  Ex. B to #152.
*See also* Supplement, Ex. C to #152, provided to Bumbo in September
2014, a computation of damages for the difference between what
Wartburg would have made had it been able to sell its inventory to
its other retail customers instead of only to Bumbo's selected
retailers.   As for the element of prejudice to Bumbo from
Wartburg's failing to comply timely with Rule 26(a), because
currently there is no trial scheduled on Wartburg's counterclaim,
the prejudice inquiry focuses on "whether [the non-disclosing
party's] failure to comply with Rule 26 prejudiced [the other
party's] ability to prepare for trial, not on whether [the party]
will be prejudiced by use of the evidence at trial."  *Norton v.
Assisted Living Concepts, Inc.*, 786 F. Supp. 2d 1173, 1189 (E.D.
Tex. 2011), *citing Primrose Operating Co. v. Nat'l Am. Ins. Co.*,
382 F.3d 546, 564 (5th Cir. 2004)(finding any prejudice to Norton
was minimal because document at issue was designated as an exhibit
before a trial date had even been scheduled, giving Norton a
sufficient amount of time to examine it and prepare for its
potential use at trial); *Texas A&M Research Foundation v. Magna
Transp., Inc.*, 338 F.3d 394, 401-02 (5th Cir. 2003)(prejudice was
negligible because witness in support of whose testimony the

invoices were offered had been designated properly as a witness before trial and any prejudice was cured by the approximately one month during which Italia was allowed to examine and respond to the contested evidence). Wartburg is agreeable to reopening discovery and expert deadlines to give Bumbo the opportunity to challenge Wartburg's supplemental damages, to take additional depositions, and designate additional experts, including a rebuttal expert on Wartburg's supplemental damages. Wartburg further points out that when it supplemented its disclosures, Bumbo did not object or move to reopen discovery or extend expert deadlines.

### Bumbo's Reply (#154)

Contrary to Wartburg's assertion in its response at p. 2 that its claim arose before the Court issued the injunction, Bumbo highlights on the very next page Wartburg's statement that Bumbo breached "its contract and forced Wartburg to sell its inventory to a limited number of customers (by virtue of the court-imposed injunction)." Moreover, Wartburg's Vice President, Mark Buchanan (#107-2 at 57:2-18), testified that Bumbo's breach of contract occurred toward the end of February 2010 and is associated with Bumbo's motion for an injunction requiring Wartburg to sell and deliver its Bumbo products to Wal-Mart, Toys "R" Us, and Babies "R" Us. Furthermore Wartburg does claim that the injunction was wrongfully issued and that Wartburg should have been free to sell the product to whomever it chose, and that if it had sold its

products elsewhere, it would have made more money. Thus it is suing for lost revenue.

Moreover Bumbo reiterates that the bond required by Rule 65(c) establishes the maximum amount of liability for a party that obtains a wrongful preliminary injunction. It argues that *Continuum Co*. is inapposite here because it addressed the court's decision not to increase a bond amount, not to dispense with a bond altogether. Under *W.R. Grace*, which Bumbo insists controls here, since there currently is no bond, Wartburg has no claim for damages, an essential element for breach of contract, and thus its retailer-limitation claim does not survive.

Furthermore, emphasizes Bumbo, Wartburg does not offer an explanation for its failure to timely disclose its alleged damages. Late disclosure of evidence during the advanced stage of a litigation is not harmless. *Hoffman v. Construction Protective Services, Inc.*, 541 F.3d 1175, 1180 (9th Cir. 2008)(that plaintiff's failure to disclose required the court to "create a new briefing schedule and perhaps re-open discovery," even set a new trial date, i.e., modifications "supporting a finding that the failure to disclose was not harmless."), *cited with approval*, *CQ Inc. v. TXU Mining Co., LP*, 565 F.3d 268, 280 (5th Cir. 2009). Permitting Wartburg now to put forth a totally new damage model would require reopening discovery, new case deadlines, new experts and more motion practice to exclude expert opinions. In the past Bumbo

relied on Wartburg's disclosures, attacked its theory of damages, and was successful in excluding opinions of its damages experts on that theory and in obtaining summary judgment on its claims.  To allow Wartburg a total do-over now is not warranted.  The Fifth Circuit's remand for this Court to determine whether there is any genuine issue of material fact on Wartburg's retailer-limitation claim does not entitle Wartburg to a fresh start.  In sum, because Wartburg had not met its burden to show that its failure to timely disclose its damages was substantially justified or harmless, it cannot be allowed to offer evidence of damages.  Therefore the Court should grant summary judgment in favor of Bumbo.

**Court's Decision Regarding Second Motion for Summary Judgment, Wrongful Injunction, and Damages Disclosure**

This Court concludes that (1) Wartburg's counterclaim is not limited to one for wrongful injunction,[14] but can and does arise out of what Wartburg claims were terms of the oral distribution agreement.  The core of  Warburg's surviving counterclaim is based on the merits of its retailer-limitation, breach-of-contract

_____

[14] As indicated in footnote 8 of this Opinion and Order, the Court cannot say as a matter of law that in the Fifth Circuit a wrongful injunction claim must fail in the absence of a bond, as Bumbo has argued.  Nor is it clear that the holding in *American Jet Charter, Inc. v. Cobbs*, 184 S.W. 3d 369, 377 (Tex. App.-- Dallas 2006), that where the district court releases a bond with no objection from the claimant, he waives recovery on it, would control here.  Nevertheless because Wartburg has not expressly asserted a wrongful injunction claim, the Court does not address the merits of one here.

counterclaim asserted in its Answer and Counterclaim (#15) and refined, as follows, in #31 at p. 7, ¶¶ 35 and 37:

> Here, Wartburg had a contract with Bumbo whereby Bumbo was contractually obligated to sell certain products to Wartburg and Wartburg, in exchange, would pay Bumbo for the products ordered subject to certain offsets, credits and returns. Under the terms of the contract, Wartburg was the owner and controlled the retailer relationships and distribution channels that it created or serviced here in the United States. In fact, Bumbo disclaimed responsibility for and expressly insisted that Wartburg be solely responsible for its retailer and distribution relationships. Under the contract, in addition to selling Bumbo's products to small retailers, Wartburg was Bumbo's exclusive distributor with respect to certain retailers--Toys "R" Us, Babies "R" Us, Wal-Mart, Burlington Coat Factory, Special Addition, USA Baby, and USA Baby/Rattle to Tattles, among others. . . .
> Bumbo . . . breached the agreement. . . . . Bumbo demanded that Wartburg only sell its inventory to certain retailers, *e.g.*, Wal-Mart, Toys "R" Us, and Babies "R" Us, to the exclusion of Wartburg's other customers.[15]

While the injunction is obviously part of Wartburg's claim against Bumbo for breach if the oral contract by forcing Wartburg to distribute the products it had received to Bumbo's three major retailers, this Court has shown that even Fifth Circuit cases, by themselves, are contradictory on the necessity of a bond for recovery of damages and on the reach of *W.R. Grace*, as well as divergent opinions among other courts. *See* footnote 8 of this Opinion and Order. "'It is a well-settled Fifth Circuit rule of orderliness that one panel of our court may not overturn another

---

[15] The Court has edited the above passage to delete those claims on which the Fifth Circuit affirmed this Court's summary judgment.

panel's decision, absent an intervening change in the law, such as by a statutory amendment, or the Supreme Court, or our *en banc* court.'"  *U.S. v. Traxler*, 764 F.3d 486, 489 (5th Cir. 2014), *quoting Jacobs v. Nat'l Drug Intelligence Ctr.*, 548 F.3d 375, 378 (5th Cir. 2008).  "'Even if persuaded that [our prior panel opinion] is inconsistent with [an earlier Supreme Court opinion], we may not ignore the decision, for in this circuit one panel may not overrule the decision of a prior panel."  *Id., citing Barber v. Johnson*, 145 F.3d 234, 237 (5th Cir. 1998).   "'It is the firm rule of this circuit that we cannot disregard the precedent set by a prior panel, even though we perceive error in the precedent.'"  *Id., quoting Wilson v. Taylor*, 658 F.2d 2021, 1034 (5th Cir. 1998).  Thus the rule of *Corrigan Dispatch*, 569 F.2d at 303, that a district court may elect whether to require a bond for a preliminary injunction, may control here, where this Court returned the bond amount to Bumbo after lifting the injunction.  If it turns out that Bumbo breached the distributorship agreement, it would be inequitable to eliminate any recovery to Wartburg because Bumbo sought to recover even its minimal bond.  Perhaps restitution might be a possibility under *Dornan*, 810 F. Supp. at 859 .

The key to identifying the remaining dispute here, as pinpointed by the Fifth Circuit on appeal, #145 at 8, is the burden of proof required for a preliminary injunction (likelihood of success on the merits), as opposed to that for judgment on the

merits of the claim (preponderance of the evidence at trial, or in the case of summary judgment, no genuine issue of material fact and the claimant shows it is entitled to judgment as a matter of law). As the Fifth Circuit opined, the result of the different standards proof for a preliminary injunction and a judgment on the merits is that "the district court's finding during the preliminary injunction phase of the proceeding that the contract contained a limitation on which retailers Wartburg could supply may be challenged at a later stage of the proceedings." *Id.* Because the Fifth Circuit found that the limitation-on-retailers breach-of-contract counterclaim was not foreclosed by the statute of frauds and remanded it "for a determination as to whether there is any genuine issue of material fact [#145 at p. 9]" for trial, the Court examines the evidence presented by the parties by reviewing Bumbo's original motion for summary judgment (#107), Wartburg's response (#120), and Bumbo's reply (#121) in the context of the record as a whole. The Court will henceforth refer to the agreement in dispute as the "distribution agreement."

As for the issues of untimely disclosure of damages, "without awaiting a discovery request," a party is required to disclose within fourteen days of the Rule 26(f) discovery planning conference "a computation of each category of damages claimed by the disclosing party--who must also make available for inspection and copying under Rule 34 the documents or other evidentiary

material, unless privileged or protected from disclosure, on which each computation is based. . . ."  Fed. R. Civ. P. 26(a)(1)(A)(iii).  "A party must make its initial disclosures based on the information then reasonably available to it.  A party is not excused from making its disclosures because it has not fully investigated the case . . . ."  Fed. R. Civ. P. 26(a)(1)(E).

It is undisputed that Wartburg failed to timely disclose the damages information relating to its surviving counterclaim.  Rule 37(c)(1), in relevant part, sets out the sanction for such a failure:  "the party is not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  Nevertheless Rule 36(c)(1)(A),(B), and(C) provides alternatives:

> In addition or instead of this sanction, the court, on motion and after giving an opportunity to be heard:
>
> (A) may order payment of the reasonable expenses, including attorney's fees, caused by the failure;
>
> (B) may inform the jury of the party's failure; and
>
> (C) may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(I)-(vi).

Rule 36(c)(1)(A)(B)(C).  The Fifth Circuit describes the sanctions of Rule 37 as "not exclusive or arbitrary," but rather "flexible, and within reason, [they] may be applied in as many or varied forms as the Court desires by exercising broad discretion in light of the facts of each case."  *Guidry v. Continental Oil Co.*, 640 F.2d 523, 533 (5th Cir. 1981)(*citing* 8 Wright & Miller, *Federal Practice and*

*Procedure: Civil* § 2289, at 791 (1970)), *cert. denied*, 454 U.S. 818 (1981).   "Rule 37 only requires [that] the sanctions the Court imposes 'hold the scales of justice even.'"   *Id., citing id.* at § 2284, at 764.

The purpose of Rule 37(c)(1) is to prevent an ambush, resulting in surprise or prejudice, of undisclosed or late disclosed evidence.  *Reed v Iowa Marine Corp.*, 16 F.3d 82, 85 (5th Cir. 1994).  Rule 37 instructs the court to make orders "as are just."   The sanctions it enumerates are not exclusive and arbitrary, but flexible, selective, and plural, and the district court may, within reason, use as many and as varied sanctions as are necessary to "hold the scales of justice even." *In re Enron Corp. Securities, Derivative & "ERISA" Litig.*, No. Civ. A. G-02-0299, *et al.*, 2007 WL 5023541, at *1 (S.D. Tex. Feb. 1, 2007), *citing* 8A Charles Alan Wright, *et al., Federal Practice and Procedure: Civil 2d* § 2284 at 612-13 (West 1994).

Furthermore, the law favors resolution of disputes on the merits over dismissal, the "draconian remedy of last resort." *FDIC v. Connor*, 20 F.3d 1376, 1380 (5th Cir. 1994); *Brinkmann v. Abner*, 813 F.2d 744, 749 (5th Cir. 1987); *Batson v. Neal Spelce Assocs., Inc.*, 765 F.2d 511, 515 (5th Cir. 1985).  Dismissal with prejudice is usually suitable only where "'its deterrent value cannot be substantially achieved by use of less drastic sanctions.'" *Brinkmann*, 813 F.2d at 749, *quoting Marshall v. Segona*, 621 F.2d

763, 768 (5th Cir. 1980). "'[D]ismissal with prejudice typically is appropriate only if the refusal to comply results from willfulness or bad faith and is accompanied by a clear record of delay or contumacious behavior.'" *Connor*, 20 F.3d at 1380, *quoting Coane v. Ferrara Pan Candy Co.*, 898 F.2d 1030, 1032 (5th Cir. 1990). No such record has been alleged, no less established, here.

The Fifth Circuit has employed a four-factor test, based on Rule 37, to determine whether exclusion of damages evidence is the appropriate sanction in a case. *Texas A&M Research Foundation v. Magna Transp., Inc.*, 338 F.3d 394, 401-02; *Heidtman v. County of El Paso*, 171 F.3d 1038, 1040 (5th Cir. 1999); *Barrett v. Atl. Richfield Co.*, 95 F.3d 375, 380 (5th Cir. 1996). These factors are (1) the party's explanation for its failure to disclose the information timely; (2) prejudice to the opposing party if the evidence is admitted; (3) the possibility of curing such prejudice by granting a continuance; and (4) the importance of the evidence. *Id.; id.; id.*

As noted *supra*, Wartburg brought the three breach-of-contract counterclaims as a single counterclaim and did not view them as separate claims, seeing all as arising from the same agreement, reflected in its initial disclosure of damages. During the litigation in this Court there were no orders issued requiring Wartburg to disclose damages relating solely to the retailer-limitation counterclaim that were ignored by Wartburg. On appeal

and as late as May 20, 2014, the Fifth Circuit affirmed this Court's statute-of-frauds bar against two and clarified the continuing viability of only the remaining counterclaim, distinguishing it as arising from a different agreement than the others.  Wartburg then provided a computation of damages on that differentiated counterclaim. *See* #152, Ex. C, "Revenue from inventory had it been sold through independent/small retailers, on September 5, 2014, complete with dollar figures," at pp. 8-9. There is no evidence that Warburg acted in bad faith[16] or willfully to keep the evidence from Bumbo, or even evasively, and it did, though belatedly, supplement its disclosures to include the disputed evidence focused solely on the retailer-limitation claim. Furthermore if the damages evidence is barred from use for summary judgment or in trial, the sanction would be especially harsh here because it would amount to a dismissal of the claim.  The damages evidence is an essential element of Wartburg's retailer-limitation breach-of-contract claim; without it, Wartburg cannot prevail no matter what evidence it might have to support the other elements. Furthermore Wartburg has agreed to a continuance to permit Bumbo to cure any prejudice.  Although Bumbo objects to further delay, this litigation has had a number of delays, occasioned by both parties.

---

[16] A duty of good faith and fair dealing under § 1.304 may apply to a distributorship agreement where the sale of the goods is the dominant factor in the agreement. *Mailing and Shipping Systems, Inc. v. Neopost USA, Inc.*, 937 F. Supp. 2d 879, 889 (W.D. Tex. 2013).

Currently there is no trial setting. The policy of favoring disposition of a case on the merits also supports a short extension for discovery on the narrow damages issue here. In sum, in the interests of justice, the Court finds the small delay that will be caused reopening discovery on this single issue is harmless and accordingly denies Bumbo's request for dismissal based on Wartburg's untimely damages disclosure.

Thus the Court denies Bumbo's second motion for summary judgment and now considers whether Wartburg's retailer-limitation counterclaim survives Bumbo's first motion for summary judgment on the merits.

### Bumbo's Original Motion For Summary Judgment (#107)

### As It Relates to Wartburg's Retailer-Limitation Counterclaim

*Applicable Law*

Because Wartburg bears the burden of proof on its counterclaim at trial, to prevail on summary judgment movant Bumbo must first offer evidence that undermines the nonmovant's claim or must point out the absence of evidence supporting an essential element of the nonmovant's claim.

Because this suit is here on diversity jurisdiction, the substantive law of Texas applies. *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78-79 (1938); *Preston Exploration Co., LP v. GSF, LLC*, 669 F.3d 518, 522 (5th Cir. 2012).

A contract for the sale of movable goods is governed by

article 2 of the Uniform Commercial Code ("UCC"), as codified in chapter 2 of the Texas Business and Commerce Code. *Morgan Bldgs. and Spas, Inc. v. Human Soc. of Southeast Texas*, 249 S.W. 3d 480, 487 (Tex. App.--Beaumont 2008), citing Tex. Bus. & Com. Code Ann. §§ 2.101-2.725.[17] A "sale" is defined as "the passing of title from the seller to the buyer for a price." Tex. Bus. & Com. Code Ann. § 2.106(a). "Goods" are defined generally as "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale." *Id.* at § 2.105(a).

Where a contract contains a mixture of sales and services, as in a distribution agreement, § 2.201 applies where the sale of goods is the "dominant factor" or "essence of the transaction." *East Hill Marine, Inc. v. Rinker Boat Co., Inc.*, 229 S.W. 3d 813, 818 (Tex. App.--Fort Worth 2007), *citing Cont'l Casing Corp. v. Siderca Corp.*, 38 S.W. 3d 782, 787-88 (Tex. App.--Houston [14th Dist.] 2001, no pet.), and *Westech Eng'g, Inc. v. Clearwater Constructors, Inc.*, 835 S.W. 2d 190, 197 (Tex. App.--Austin 1992, no writ). Moreover § 2.106 states that "'contract for sale' includes both a present sale of goods and a contract to sell goods at a future time." *East Hill Marine, Inc.*, 229 S.W. 3d at 818.

---

[17] "The UCC supersedes the common law. To the extent that the UCC does not resolve a question, courts generally look to the common law." *United Galvanizing, Inc. v. Imperial Zinc Corp.*, Civ. A. No. H-08-0551, 2011 WL 11185, at *9 (S.D. Tex. Jan. 3, 2011), citing Texas Business & Com. Code Ann. § 1.303(b).

Thus the parties' oral distribution agreement is governed by the Texas UCC.  *Id.* (finding that the parties's oral agreement for Rinker Boat Company to manufacture and deliver boats and then for East Hill Marine as the exclusive Dallas dealer to resell them in its own showrooms, supported by the conduct of the parties, is subject to the UCC).  Moreover the Fort Worth court of appeals in *East Hill Marine* opined at 819 & nn. 2 and 3 (citing cases):

> Although only one Texas case[18] has discussed whether a distributorship agreement is a "contract for the sale of goods" under the UCC, the overwhelming majority of jurisdictions that have considered the question have concluded that distributorship agreements are subject to the UCC.  We will follow the majority rule in holding that the dominant factor or essence of each of the alleged agreements was a contract for the sale of goods, and thus each was subject to the UCC.

Whether an agreement is an enforceable contract and legally binding is a question of law, while whether an agreement was reached at all is a question of fact.  *Westlake Petrochemicals, LLC v. United Polychem*, 688 F.3d 232, 238-39 (5th Cir. 2012).

The lenient § 2.204 of the Texas Business and Commerce Code Annotated ("Formation in General") states:

> (a) A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract.

> (b) An agreement sufficient to constitute a contract for

---

[18] *Cont'l Casing Corp.*, 38 S.W. 3d at 787-88 (holding that an agreement between a pipe manufacturer and a dealer was a distributorship and was covered under the UCC."). *East Hill Marine*, 229 S.W. 3d at 819 n.2.

sale may be found even though the moment of its making is
undetermined.

(c) Even though one or more terms are left open a
contract for sale does not fail for indefiniteness if the
parties intended to make a contract and there is a
reasonably certain basis for giving an appropriate
remedy.

Furthermore a valid oral contract may be formed under the

exceptions of § 2.201(c)(2) and (3) to the UCC's statute of frauds

(§ 2.201(a) and cmt. 1 (a contract for the sale of goods for the

price of $500 or more is not enforceable absent some writing

evidencing such a contract that is signed by the party against whom

enforcement is sought and that specifies a quantity).   Section

2.201(c) provides in relevant part:

(c) A contract which does not satisfy the requirements of
Subsection (a) but which is valid in other respects is
enforceable . . .

(2) if the party against whom enforcement is sought
admits in his pleading, testimony or otherwise in
court that a contract for sale was made, but the
contract is not enforceable under this provision
beyond the quantity of goods admitted; or

(3) with respect to goods for which payment has
been made and accepted or which have been received
and accepted (Section 2.606).[19]

---

[19] Section 2.606, "What Constitutes Acceptance of Goods,"
provides in relevant part,

(a) Acceptance of goods occurs when the buyer

(1) after a reasonable opportunity to inspect the
goods signifies to the seller that the goods are
conforming or that he will take or retain them in
spite of their non-conformity; or . . .

*Aldridge v. Avara*, No. 14-05-01283-CV, 2007 WL 2366964, at *5 (Tex. App.--Houston [14ᵗʰ Dist.] Aug. 21, 2007, no pet.).

To establish an enforceable oral contract under the UCC, the plaintiff must prove (1) a valid oral contract existed and (2) acceptance within the meaning of § 2.201(c)(3). *Aldridge*, 2007 WL 2366964 at *5. Evidence that both parties' conduct recognized the existence of such an agreement may establish a contract for the sale of goods under § 2.204.[20] *Id.* As noted, "[a]cceptance of the goods occurs when the buyer . . . does any act inconsistent with the seller's ownership" under § 2606(a)(3); for instance, physical possession and exercise of dominion over the goods may constitute acceptance, an act inconsistent with the sellers's ownership, and thus support a finding of acceptance of goods. *Id.* at *5, *citing Ho v. Wolfe*, 688 S.W. 2d 693, 696 (Tex. App.--Amarillo 1985, no writ)("The receipt and retention of the goods tendered by delivery have been held sufficient to constitute an acceptance under section 2.606(a).").

---

(3) does any act inconsistent with the seller's ownership; but if such act is wrongful as against the seller it is an acceptance only if ratified by him.

(b) Acceptance of any part of a commercial unit is acceptance of that entire unit.

[20] Section 2-207(3) also states, "Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract."

Whether a contract is implied from the facts and circumstances is a question of fact for the factfinder. *Aldridge v. Avara*, 2007 WL 2366964, at *5, *citing Preston Farm & Ranch Supply, Inc. v. Bio-Zyme Enters.*, 625 S.W. 2d 295, 298 (Tex. 1981)(a contract formed by conduct is one implied in fact and has been recognized in Texas prior to the enactment of the Texas version of the UCC), *citing Marr-Piper Co. v. Bullis*, 1 S.W. 2d 572, 575 (Tex. Comm. App. 1928, judgment adopted)("A contract implied in fact is one in which, under the circumstances, the acts of the parties are such as to indicate according to the ordinary course of dealing and the common understanding of men a mutual intention to contract, as where one accepts the tendered service of another under circumstances justifying the inference that such other expected to be paid for such services. . . . A contract implied from the facts and circumstances in evidence is as binding as would be an expressed one.").

Because there is no evidence that the oral distributorship agreement here established a term for its duration, under § 2.309(b), "Where the contract provides for successive performance but is indefinite in duration it is valid for a reasonable time but unless agreed may be terminated at any time by either party." Even in Texas, where employment is "at-will" and "terminable at any time by either party, with or without cause, absent an express

-39-

agreement to the contrary,"[21] Section 2.309(c) of the Texas Business & Commerce Code Ann. overrides the at-will doctrine in part in providing, "Termination of a contract by one party except on the happening of an agreed event requires that reasonable notification be received by the other party and an agreement dispensing with notification is invalid if its operation would be unconscionable." Recovery of damages for a breach of contract under such circumstances is limited to the notice period. *King v. Exxon Co., U.S.A.*, 618 F.2d 111, 1119 (5th Cir. 1980)("We find the proper measure of damages is the net profit that would have been earned by the plaintiff during that period of time constituting reasonable notice of termination." "What constitutes a reasonable notice of termination" will vary in accordance with the facts and circumstances of each case" and is a fact question for the jury. *Id.* In *Coburn Supply Co., Inc. v. Kohler Co.*,342 F.3d 372, 376 (5th Cir. 2003), the appellate court opined, "While no Texas case squarely addresses the issue of reasonable notification in the sale of goods context, the cases on this issue outside of our jurisdiction uniformly hold, even in the context of an exclusive distributor relationship, that reasonable notification calls for such notification as will give the other party reasonable time to seek a substitute agreement (citations omitted)." Thus damages for

---

[21] *Coburn Supply Co., Inc. v. Kohler Co.*,342 F.3d 372, 375 (5th Cir. 2003), *citing inter alia W.G. Pettigrew Distrib. Co. v. Borden, Inc.*, 976 F. Supp. 1043, 1054 (S.D. Tex. 1996).

a breach-of-contract claim are based on whether the terminating party gave reasonable notice to the other party.  *Id.* at 375.

Section 2.106(c) and (d) provide and distinguish two ways of ending a sale of goods agreement, with emphasis added by this Court:

> (c) "Termination" occurs when either party pursuant to a power created by agreement or law puts an end to the contract *otherwise than for its breach*.  On "termination" *all obligations which are still executory on both sides are discharged but any right based on prior breach or performance survives*.

> (d) "Cancellation" occurs when either party puts an end to the contract *for breach by the other* and its effect is the same as that of "termination" except that *the cancelling party also retains any remedy for breach of the whole contract or any unperformed balance*.

*Bumbo's Factual Allegations*

Supported by documentary evidence, especially the deposition testimony of Mark Buchanan (#107-2, Ex. A), Bumbo alleges the following facts about history of the parties' performance of their oral distributorship agreement (#145 at pp. 2-3, footnotes eliminated).  In the regular course of business between the parties from 2003 to 2010, when Bumbo claims that Wartburg terminated the distribution agreement, the parties' general practice was for Wartburg to order from Bumbo by submitting a written purchase order or similar document stating the quantity and specifications of the products Wartburg desired.  Each purchase order represented a container of product costing approximately $30,000.  Bumbo would

ship the requested products to Wartburg and, typically, issue commercial invoices that confirmed the quantity, general description, payment terms, and cost of the shipped goods.  Upon receipt of the goods, Wartburg would distribute them to the end retailers.

Bumbo claims Wartburg's purchase orders and the parties' oral agreement required Wartburg to pay Bumbo for the product, as reflected in Bumbo's invoices.  There were no other written agreements representing the terms or obligations of the parties for the distribution of Bumbo products by Wartburg.

Bumbo claims as the "essential understanding of the unwritten distributorship agreement" that "Wartburg would buy goods from Bumbo via purchase orders, and in exchange for Warburg's services as a distributor and payment of the product, Wartburg would be allowed to purchase the goods on credit."  #107-1 at p. 3.

On the other hand, Wartburg claims that the oral agreement required Bumbo to sell its product to Wartburg indefinitely as long as Wartburg timely paid the prices that they agreed upon.  Wartburg further claims that it agreed to find retailers and build a market in the USA and that Bumbo would supply Wartburg with the product to fulfill the orders.  #107 -1 at p. 3.  In addition Wartburg claims that Wartburg was not only Bumbo's sole distributor to certain

retailers[22] but also that it owned and controlled the retailer relationship and distribution channels in the United States under the oral agreement.  (Thus it counterclaims that Bumbo breached the distribution agreement by forcing Wartburg, prior to termination of the contract, to deliver its remaining Bumbo inventory to Wal-Mart, Toys "R" Us, and Babies "R" Us to the exclusion of its other clients.)  The parties agree that none of these claimed terms was in writing.

Regarding the dissolution of the contract, Bumbo claims that over the years Wartburg became unable to meet the volume of distribution Bumbo required in the United States and that Wartburg developed a significant trade deficit, which forced Bumbo to suspend shipments of its product for distribution through Wartburg.  Bumbo further complains that the suspension strained Bumbo's relationships with the retailers.  Despite repeated requests from Bumbo, Bumbo claims that Wartburg did not reduce its trade deficit nor adequately increase handling the volumes of distribution needed by the retailers.  Bumbo further contends that it repeatedly asked Wartburg for a Letter of Credit, financial statements or other forms of collateral, to no avail.  Wartburg has admitted that at the time it claims Bumbo breached the oral agreement, Wartburg's trade deficit with Bumbo was approximately $1.7 million.  Ex. A, Buchanan Dep.,

---

[22] Except to Target and One Step Ahead, which Bumbo supplied directly.

114:14-17.

Finally, Bumbo alleges, in an email (copy at #120-5, Ex. 5) on February 3, 2010 it gave notice to Wartburg of its determination to use an additional, "alternative" distributor to distribute Bumbo's products in the United States, with which it expected Wartburg to cooperate, and to require Wartburg to provide evidence of its debtor's obligations and schedules of payment to be made to Bumbo and warned: "If this is unacceptable . . ., we suggest an urgent meeting to discuss your exit strategy." *See* emails and letter, #120-5, 120-7. Bumbo maintains that in doing so, it did not terminate or cancel the parties' agreement, but simply provided an alternative way that Wartburg could continue to distribute Bumbo products in this country, along side of a new distributor. Bumbo described its notice as "a strategic step in an effort to alleviate the continuing pressure [on Bumbo because of the extensive credit deficiency] from our local banks," a suggested way "to rectify unwarranted credit extended to your company" and to "relie[ve the] burden on Wartburg by redirecting a major debtor to an alternative distributor approved by our local bank," and to gain "[Wartburg's cooperation" in eliminating said credit by providing justifiable documentation in the form of its debtor's obligations and schedules of payment." #120-7. Wartburg refused to comply, and thus, according to Bumbo, it was Wartburg which terminated their relationship.

-44-

Under § 2.609, a contract may be anticipatorily breached when a buyer fails to assure a seller, who has a reasonable basis for believing that the buyer may fail to meet its contractual obligations, that it is able to pay for the goods.  Seller Bumbo insists that it had the right to demand assurance from Wartburg regarding its ability to perform its contractual obligations and/or pay for the goods, as required by § 2.609(a), (b), and (d) (right to assurance of security and suspend delivery when Bumbo did not receive that assurance):

> (a) A contract for sale imposes an obligation on each party that the other's expectation of receiving due performance will not be impaired.  When reasonable grounds for insecurity arise with respect to the performance of either party the other may in writing demand adequate assurance of due performance and until he receives such assurance may if commercially reasonable suspend any performance for which he has not already received the agreed return.
>
> (b) Between merchants[23] the reasonableness of grounds for insecurity and the adequacy of any assurance offered shall be determined according to commercial standards. . . .
>
> (d) After receipt of a justified demand failure to provide within a reasonable time not exceeding thirty days such assurance of due performance as is adequate under the circumstances of the particular case is a repudiation of the contract.

---

[23] A "merchant" is defined in § 2.104(a) as "a person who deals in goods of the kind or otherwise by his occupation holds himself out a having knowledge or skill peculiar to the practices or goods involved in the transaction or to whom such knowledge or skill may be attributed by his employment of an agent or broker or other intermediary who by his occupation holds himself out as having such knowledge or skill.

Even though claiming it did not cancel the distributorship agreement, Bumbo maintains that it had the right to do so. Section 2.703 provides that when "the buyer . . . fails to make a payment due . . . or repudiates [the contract] . . . the aggrieved seller may . . . cancel." As noted above, no notice is required to cancel a contract. *See also Int'l Therapeutics, Inc. v. McGraw-Edison Co.*, 721 F.2d 488, 491-92 (5th Cir. 1983)(oral agreement based on course of dealing over five years ended after buyer failed to make timely payment for a shipment and failed to respond to seller's letter requesting assurance of the buyer's performance as required under §§ 2-703 (failure to make timely payment), 2-609(1) and (4), and 2-703 (when buyer repudiates, seller may cancel).).[24]   Relying on

---

[24] In its response (#120), Wartburg argues that not only did Bumbo not have a right to cancel because Wartburg did not breach the oral distribution agreement, but also contends that *International Therapeutics* is inapposite to the situation in the instant case. In this case, after five years of operating under an oral agreement, pursuant to which the buyer would forecast its needs, the manufacturer would manufacture the products in accordance with the forecast within 30 to 90 days, and the buyer was obligated to pay within 30-90 days of receiving the goods, the relationship deteriorated: the purchase orders were not filled within the 30 to 90 day period and the buyer failed to make payment for more than 200 days. The manufacturer asked for assurance in the form of a financial statement or admonished that it would not ship the goods, but the buyer did not produce one. Therefore over a month later the manufacturer advised that it was cancelling the remaining orders because the seller had not produced the financial data. The buyer argued that the manufacturer was contractually bound by "a course of dealing" to provide the buyer with an indefinite supply of goods and that the termination without notice had caused it to lose profits. The Fifth Circuit held that there was no extant course of dealings between the parties to support the buyer's claim because the buyer forfeited its position by failing to make timely payments

*Int'l Therapeutics*, Bumbo insists it had the right to cancel the agreement: Wartburg repeatedly failed to make timely payments under the terms of the distribution agreement, Wartburg built up a substantial trade deficit that injured Bumbo, and Bumbo frequently asked Wartburg to provide assurance of its ability to satisfy that deficit in the form of a letter of credit or financial records, but Wartburg failed to make payment or to provide reasonable assurances.

Even if Bumbo did not have the right to cancel the agreement, Bumbo claims it had a right to terminate the agreement under § 2-309 because the contract did not have a definite term of duration and because in an email dated February 5, 2010 (#107, Exhibit E), Bumbo gave Wartburg clear and reasonable notice that it had decided to retain another distributor to also work in the United States and thus offered Wartburg an "alternative or substitute" distribution

---

and by failing to furnish the financial statement. Furthermore it concluded that the sporadic dealings between the two parties after that forfeiture was insufficient to establish a course of dealing that would entitle the buyer to any remedy.

According to Wartburg, that case is distinguishable from the instant one because a course of dealing still existed between Bumbo and Wartburg at the time Bumbo purportedly cancelled the agreement and therefore Bumbo did not have an absolute right to cancel. As supported by Wartburg's summary judgment evidence, the established practice of Wartburg's forecasting its needs to Bumbo, with Bumbo then approving or modifying the order and then shipping the products to Wartburg, and Wartburg paying Bumbo in accordance with the parties' agreement and course of dealing, indeed every 1-2 weeks from 2006 on, continued until the recall forced the parties to modify their payment plan by agreement. Moreover, as will be discussed, Wartburg contends that it did comply with Bumbo's request for financial information. #120, Exhibits 12, 16, 17, 17A, 17B, 18.

agreement to work with the additional distributor. Wartburg adamantly rejected this "alternative" or "substitute" agreement. Since no Texas cases examine what is "reasonable" notification of termination in the sale-of-goods context, Bumbo cites *Coburn Supply Co.*, 342 F.3d at 376, in which the Fifth Circuit looked to cases outside its jurisdiction to determine whether the 105 days' notice given by Kohler to Coburn was reasonable and decided that it was. "[T]he reasonableness of notice is 'measured in terms of the ability of the party affected by the termination to obtain a substitute arrangement.'" *Id., quoting Serpa Corp. v. McWane Inc.*, 199 F.3d 6, 8-9 (1ˢᵗ Cir. 1999), and *citing Teitelbaum v. Hallmark Cards Inc.*, 25 Mass. App. Ct. 555, 520 N.E. 2d 1333 (1988)(When the buyer obtained a new supplier by the date the termination was to be effective, the notice of termination given by the seller was reasonable). Bumbo also claims that where a party fails to give sufficient time to make alternative arrangements, the party is only liable for profits lost during what would have been a reasonable time period to give notice before terminating the contract.[25]

### Wartburg's Response (#120)

Wartburg first responds to Bumbo by arguing that Bumbo had no right to cancel the contract because Wartburg did not breach it.

---

[25] Bumbo also argues that there was no valid and binding contract because of the statute of frauds in § 2.201, but the Fifth Circuit has concluded that the agreement satisfies the exception in § 2.201(c)(2) to the statute of frauds.

Second, Warburg maintains that it paid Bumbo according to the terms of the oral distribution agreement and the parties' course of dealing.  It insists that Bumbo had agreed repeatedly to extend Wartburg a substantial credit balance.  Finally, Wartburg claims that Bumbo's two-day notice of cancellation was not reasonable.

Regarding the purchase orders, payments, supply and delivery, and credit terms between Bumbo and Wartburg, Wartburg shows with documentary evidence that the terms changed over time during the parties' relationship as Wartburg distributed Bumbo products to more and more retailers.  Initially Wartburg was allowed to distribute the Bumbo seats only to schools, hospitals, and therapists, but not to retailers.  From 2003-05 Wartburg paid Bumbo on a cash basis. In 2005, as demand from Bumbo's major retailers increased and Bumbo and Wartburg agreed that Wartburg would distribute Bumbo products to them, Wartburg told Bumbo that Wartburg needed credit to supply those products to those retailers.  Even without inevitable delays, because it takes approximately 4-6 weeks for shipment of the product to the United States from South Africa, and then another 60 days after the retailers received the goods before they paid Wartburg, Wartburg told Bumbo that it needed approximately 120-150 days before it received payment from the retailers and that Wartburg did not have the cash flow to pay by Bumbo's 90-day deadline in the invoices.  Although the parties continually argued about the delay in Wartburg's payments, Bumbo nearly always ended up filling

Wartburg's order and shipping products to Wartburg.   Once Bumbo extended credit to Wartburg, Wartburg would provide projections for the requirements of its retailers, along with projections of the amount Wartburg would be able to pay and when, and the parties would address Wartburg's cash flow problems and Bumbo would either approve or disapprove the quantity of Wartburg's order.   Once Bumbo agreed to payment terms, Bumbo would ship the requested baby seats to Wartburg.    Initially Bumbo set an $800,000 credit limit for Wartburg.  In 2007, however, the Consumer Products Safety Commission recalled Bumbo's baby seat.   Wartburg now claims, but not until sometime after the preliminary injunction issued, that Bumbo offered Wartburg exclusive distributorship rights for the sale of Bumbo products in the United States in exchange for Wartburg's serving as Bumbo's representative in the recall.    Wartburg accepted and allegedly performed all the recall obligations in addition to handling all the stock issues regarding distribution of Bumbo's products to the major retailers, and was commended by Bumbo for its successful management of the situation.  Ex. 26, November 9, 2007 Letter from Bumbo's General Manager, Johan Van Jaarsveld, to Wartburg; Ex. 120-26, ¶ 5.

Wartburg alleges that Bumbo also asked Wartburg to demonstrate its commitment to being the sole distributer for Bumbo products by paying for an inventory that could not yet be sold because of the recall. Ex. #120-27 ¶ 6.  Bumbo's representative, Gerhard Wagenaar,

told Wartburg's Mark Buchanan that Bumbo had a cash flow problem and needed cash to finance the recall, so Wartburg advanced a payment of $895,000 for the stock, while incurring losses in repaying distributors for defective and destroyed seats, and for storing baby seats and reworking baby seats during the recall. *Id.* At that time Wartburg's credit balance soared to approximately $3,292,761 because stock that was ordered could not be sold because of the recall, but that balance subsequently diminished. Ex. 120-28 Gerhard Wagenaar Deposition, 31:24-32:12; Ex. 15, Purchases and Payments Schedule, at 12/17/07 credit balance and 1/2/09 credit balance. Wartburg claims that throughout the recall period, it was told it "would be getting sole distributorship out of it."[26]  Ex. 120-2, Mark Buchanan's Deposition, 50:12-52:5; Ex. 28, Gerhard Wagenaar Dep., 45:13-21.

From May through July 2009, the retailers were short of stock, so Wartburg asked Bumbo to increase its credit balance to allow it to meet the demand. Although Warburg's credit balance in July 2009 was approximately $2,200,000, Bumbo agreed and raised Wartburg's credit limit to $3,000,000, conditioned upon Wartburg's reduction of its credit below $2,2000,000 by the end of the year and below $1,000,000 by July/August 2012.  #120-14, 7/21/19 email from

---

[26] Part of Warburg's helping Bumbo consisted of buying out the stock of another distributor, Bright Ideas (which Bumbo terminated for failure and inability to pay for Bumbo goods) "to get him out of the picture." Ex. 2, Buchanan Dep., 52:12-19; Ex.28, Gerhard Wagenaar Dep., 16:17-17:17.

Buchanan to G. Wagenaar; Ex. #120-2, Buchanan Declaration ¶¶ 9 and 10.  Wartburg also agreed to forfeit its 2.4% volume discount to cover the interest on the account.  *Id.*  Even though Wartburg's credit balance rose to approximately $2,900,000 in September 2009, Bumbo kept shipping products to Wartburg for distribution.  Ex. 27, ¶10; Ex. 2, 31:6-33:1.  By February 2010, Wartburg's credit balance had been reduced to $1,200,000.  Ex. 15.

Nevertheless on February 3, 2010, without any advance notice, Wartburg insists that Bumbo terminated its agreement with Warburg by an email stating that Bumbo's board of trustees had decided to award an alternative USA distributor the distribution of Bumbo products to Keen, purportedly on the grounds that Wartburg could not provide proof of collateral in the United States nor eliminate its credit balance with Bumbo.  Ex. #120-5, 2/13/10 email from Johan Buitendag to Buchanan.  Although Wartburg sent a response (Ex. #120-6), reminding Bumbo of  their agreement that if Wartburg kept the credit balance below $2,000,000 and made regular payments to reduce it as noted and that there would be no problem with supplying product to Wartburg, and requesting a meeting with the board, on February 5, 2010 Bumbo informed Warburg that the award of a distributorship to Keen was a "done deal."  Ex. #120-7, 2/05/10 email from Buitendag to Buchanan.  On February 9, 2010 Wartburg told Bumbo it was "not prepared to work with another distributor in the USA for the various past and future reasons [] discussed" and asked

again for a meeting.  #Ex. 33.  On February 17, 2012 Wartburg sent a letter to Bumbo stating that Bumbo has terminated the verbal exclusive distribution agreement by hiring another distributor in the United States.  Ex. 9.

Wartburg addresses Bumbo's arguments.  First Wartburg observes that in its motion for summary judgment Bumbo claims that "it did not terminate or cancel the relationship between the parties in its February 2010 notice, but then goes on to argue that it had the right to do so under § 2.106 and 2.609 (Wartburg's failure to furnish assurance of payment after being requested to do so).  Wartburg claims there is a genuine issue of material fact whether Bumbo did cancel the agreement regardless of its right to do so.

Wartburg points out that a contract may be explained or supplemented by the parties' course of dealing where the acts of the parties indicate a common understanding as to the contract.  Tex. Bus. & Commerce Code Ann. §§ 1.201(3)("'Agreement,' as distinguished from 'contract,' means the bargain of the parties in fact, as found in their language or inferred from other circumstances, including course of performance, course of dealing, or usage of trade as provided in Section 1.303.") and 1.303(b)("A course of dealing is a sequence of conduct concerning previous transactions between the parties to a particular transaction that is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct.").  Wartburg insists that the

course of dealing between Bumbo and itself shows that Wartburg paid for the products according to the parties' course of dealing, that Bumbo accepted and agreed to allow Wartburg a large credit balance, and that Wartburg repeatedly provided Bumbo with assurances of performance.   Thus genuine issues of material fact exist about whether Wartburg breached the oral distributorship agreement with Bumbo.

As for payments, Bumbo and Wartburg had a seven-year business arrangement for distributing Bumbo's products to retailers in the United States.   In the year before Bumbo terminated the agreement, Wartburg paid Bumbo over $7,500,000 (Ex. #120-15, payments 1/02/09 through 12/21/09); in the month before Bumbo terminated the contract, Wartburg paid Bumbo approximately $1,162,886 and reduced its credit balance to $1,200,000 (*id.*); the day before Bumbo cancelled the contract Wartburg paid Bumbo $150,327; and after Bumbo breached the agreement, on February 8, 2010 Wartburg paid Bumbo $108,300.   Thus Bumbo's claims that Wartburg "wholly failed or refused to make payment" are false and misleading.   Bumbo has not established a breach by Wartburg that would support an absolute right to cancel the agreement without notice to Warburg.

As for Bumbo's extension of credit, Wartburg has shown the agreement and the course of dealing between Bumbo and itself established that Bumbo agreed to allow Wartburg a large credit balance.   Once Wartburg became the sole distributor after the

recall,[27] Wartburg's retailers were severely short of stock because earlier Bumbo distributor Bright Ideas had left a shortage and because the retailers increased their demand.   #120-27, ¶ 7. Wartburg claims that in May 2009, Wartburg was ahead of its payment terms by 60 days.  To meet the retailers' inventory needs, Wartburg asked Bumbo to reconsider its credit limit.  #120-10; #120-27 ¶ 8. Wartburg on May 19, 2009 provided a payment plan to Bumbo that offered to make weekly rather than bi-weekly payments, and Wartburg assured Bumbo that the new shipment of Bumbo product would be in cash flow within 70-80 days of arrival in Houston.  #120-11, 5/19/09 email from Buchanan to G. Wagenaar; #120-27, ¶8.  Wartburg also signed a document stating that the stock would remain the property of Bumbo until Wartburg paid for it.  #120-12, 5/27/09 email from Buchanan to G. Wagenaar; #120-27, ¶ 8.  Bumbo verbally agreed to the manufacturing schedule and shipped the product to Wartburg.  #120-13 6/14/09 email from Buchanan to G. Wagenaar; #120-27, ¶ 8.

In July 2009, when Wal-Mart's needs were still not met, Wartburg sought to solve the shortage of all the major retailers and asked Bumbo for an increased credit limit and received one for $3,000,000 on Wartburg's promise that it would reduce its credit balance below $2,000,000 by the end of 2009 and below $1,000,000 by July/August 2010.  As noted, by February 2010 Wartburg had its

---

[27] Gerhard Wagenaar testified that Wartburg was Bumbo's sole distributor to the United States from 2007 to late 2009.  #120-28 at 20:11-16.

credit balance down to $1,200,000.  There is a clear course of dealing regarding the credit terms extended to Wartburg by Bumbo, agreed to by Bumbo, as evidenced by its allowing Wartburg's credit balance to rise to $2,900,000 in September 2009 and its continued shipment of product to Wartburg.  Bumbo's unilateral decision in February 2010 that Wartburg's credit balance was unacceptable is contrary to the agreement and course of dealing between the parties. Wartburg insists it was not in breach of the agreement for carrying a credit balance to which Bumbo agreed and acquiesced.  Thus Bumbo had no absolute right to cancel the distribution agreement, and there are genuine issues of material fact as to whether Bumbo had the right to cancel.

Regarding Wartburg's assurances of financial security to Bumbo, when merchants are involved, § 2.609(b) provides that "the reasonableness of grounds for insecurity and adequacy of any assurance offered shall be determined according to commercial standards."  Bumbo incorrectly asserts that it repeatedly asked Wartburg for a Letter of Credit, financial statements or other forms of collateral, but that Wartburg refused or failed to provide such to protect the trade balance that Bumbo was carrying for Wartburg. Although conceding it did not provide a Letter of Credit, Wartburg emphasizes that its assurances to Bumbo were not only reasonable, but they were accepted by Bumbo.  As examples, Wartburg points out that it informed Bumbo on May 27, 2009 that its bank would not lend

it money against a product that had been recalled.  #120-12, 5/27/09 email from Buchanan to G. Wagenaar.  Wartburg proposed that Bumbo stock was the only thing that could secure the investment and therefore offered to give Bumbo a document stating that the "stock remains the property of Bumbo International until such time as Wartburg paid for it."  *Id.*  After Bumbo asked on June 30, 2009 for information on Wartburg's financial standing (e.g., bank statements, payment schedules and auditor reports, Wartburg provided contact information for its accountant and told Bumbo it was welcome to call and "find out the financial stability of Wartburg . . . and how [it was] managing [its] cost control."  #120-32, 6/30/09 email from G. Wagenaar to Buchanan; #120-16, 7/14/09 email from Buchanan to G. Wagenaar.  For a similar request, on July 15, 2009 Wartburg sent Bumbo summaries of its bank statements from March through June 2009, reurged Bumbo to call its accounting company, and gave Bumbo a letter regarding ownership of the product until payment was made. #120-17, including attachments 17-A and 17-B.  On July 21, 2009, Wartburg further explained that the recall meant no financial institution would finance the Bumbo shipments because of the recall and lawsuits and that its could not turn its "cash flow cycle into a 60 day cycle overnight with the stock demand."  #120-14, 7/21/09 email from Buchanan to G. Wagenaar.[28]

---

[28] Wartburg also argues that in a declaration from Rupert Gebers, Wartburg's sole owner and president, purportedly Ex. 20, Gebers proposed the following alternative: that Wartburg's orders

In sum, Wartburg maintains that throughout its relationship with Bumbo, Wartburg was always responsive to Bumbo's demands and requests for details about Wartburg's financial status.  Because the recall of Bumbo's seats made it impossible for Wartburg to obtain financing from its bank in the United States, to continue ordering products and distributing them to the retailers, including Wal-Mart, Toys "R" Us, and Babies "R" Us, Wartburg had to purchase products from Bumbo on credit.  Bumbo had agreed to that arrangement and continued to ship products to Wartburg for distribution.  There was ongoing communication between the two parties about when Wartburg would make payments.  Under such circumstances, the assurances Wartburg provided to Bumbo were adequate and reasonable.  Wartburg has produced evidence showing that it was paying for the products it ordered and reducing its line of credit in accordance with the parties' agreement.  Wartburg insists that Bumbo has failed to

---

would be based on future sales forecasts; that Wartburg would pay all transport shipping costs from South Africa to Wartburg's warehous in Conroe, Texas; that Wartburg would pay all warehousing, distribution, and marketing costs; that Bumbo would see all invoices generated from the sales; that Wartburg and Bumbo together would appoint a facilitator such as an Accounting firm or lawyer and open a bank account into which all the sales monies owed by debtors would be placed, and upon receipt of those payments, Bumbo would be paid its portion of the money owed to it by Wartburg and Wartburg would receive the remaining amount and also pay for all administrative costs incurred.  Wartburg contends that this proposal along with Wartburg's assurances, satisfied Bumbo because Bumbo continued shipping products to Wartburg and increased Wartburg's credit limit in 2009.  Exhibit 20, however, is not a declaration from Gebers, nor could the Court find such in the summary judgment evidence.

establish a breach by Wartburg that would allow it to cancel the oral distribution agreement.

Finally, citing *Coburn Supply*, 342 F.3d at 376 (finding 105 days was adequate notice to enable the distributor to locate an alternate supply source within 6 weeks after receipt of the notice of termination), Wartburg argues that Bumbo's February 3, 2010 email, informing Wartburg that Bumbo had decided to hire an alternative USA distributor, failed to provide reasonable notice to it that Bumbo was terminating the sole distributorship agreement. The email both terminated the agreement with Wartburg as it hired another distributor, giving Wartburg no time to obtain a substitute agreement or obtain new customers  Two days later Bumbo confirmed that the termination/transfer of Toys "R" Us and Babies "R" Us to another distributor was a "done deal."  Two days' notice was not reasonable or adequate for Wartburg to find accounts to replace these two accounts nor to obtain a new distributorship agreement. While Bumbo claims it offered Wartburg an alternative arrangement (working along side of Keen Distribution to which Bumbo had transferred Wartburg's two big accounts and without an exclusive distributorship agreement), that offer did not constitute an adequate substitute for the contract that Bumbo terminated.

### Bumbo's Reply (#121)

Although still vehemently denying that Warburg was ever an exclusive distributor of Bumbo's products, Bumbo argues that even

if it were true, Wartburg's claims still fail as a matter of law.

Bumbo argues that Wartburg tries to convince the Court that Bumbo's February 2010 notice did not cancel the parties' oral distribution agreement. #120, Response at § V(A). Yet Wartburg is suing Bumbo for cancelling the same agreement. As Wartburg states in its Response at page 27, the February 2010 email notified Wartburg that Bumbo "had decided to award an 'alternative USA distributor the distribution of Bumbo products to [Toys "R" Us and Babies "R" Us]." Yet referencing the same email, Wartburg continues, "Bumbo effectively terminated its sole distributorship with Wartburg . . . ." Id. To the extent that a sole distributorship may have exited between the two parties, which is the entire basis of Wartburg's surviving counterclaim, it was indisputably canceled by this email communication/notification of that fact.

Wartburg also points to Bumbo's statement in its motion that Bumbo did not terminate or cancel the *relationship* between the parties and argues that it creates a fact issues as to whether Bumbo cancelled the parties' *agreement*. That sentence indicates that Bumbo did not completely end the parties' relationship, but gave Wartburg an opportunity to work along with another distributor to distribute Bumbo products in the United States. There is no fact issue about this point.

To Warburg's contention that Bumbo did not have the right to

cancel the agreement because the parties' course of dealing establishes that Wartburg was not in breach of the contract so as to give Bumbo that right, Bumbo points to Wartburg's admission throughout its response that the amount of credit and the length of time the credit was extended to Wartburg fluctuated drastically over the years. Wartburg's response at page 7 concedes that "the timing of payment was an on-going issue between Bumbo and Wartburg."[29] Thus Wartburg's recitation of the facts demonstrates that there was no standard course of dealing with regard to credit balance and financial security, but instead an ongoing negotiation for varying credit balance levels, product supply levels, and assurances of

─────────────────

[29] This Court observes, "'To qualify as a judicial admission [a] statement must be (1) made in a judicial proceeding; 92) contrary to a fact essential to the theory of recovery; (3) deliberate, clear and unequivocal; (4) such that giving it conclusive effect meets with public policy; and (5) about a fact on which a judgment for the opposing party can be based.'" *Jonibach Management Trust*, 750 F.3d at 491 n.2, *quoting Heritage Bank v. Redcom Labs., Inc.*, 250 F.3d 319, 329 (5th Cir. 2001). "Factual assertions in pleadings . . . are considered to be judicial admissions conclusively binding on the party who made them." *White v. ARCO/Polymers, Inc.*, 720 F.2d 1391, 1396 (5th Cir. 1983). A party cannot present evidence contradicting admissions made in his pleadings for the purpose of defeating a summary judgment motion. *Davis v. A.G. Edwards & Sons, Inc.*, 823 F.2d 105, 107-08 (5th Cir. 1987). Furthermore facts admitted in pleadings "are no longer at issue." *Id.*, *citing Ferguson v. Neighborhood Housing Services, Inc.*, 780 F.2d 549, 551 (6th Cir. 1986). Although judicial admissions are not by themselves evidence, a judicial admission has the effect of withdrawing it from contention. *Martinez v. Bally's Louisiana, Inc.*, 244 F.3d 474, 476 (5th Cir. 2001).

payment over time.[30]

Nor does Wartburg dispute that the written invoices that Bumbo submitted to Wartburg immediately after it placed orders and before any products were shipped expressly required payment by Wartburg within 90 days.  The UCC's default rules on payment, § 2.310(1), states that full payment for goods "is due at the time and place at which the buyer is to receive the goods even though the place of shipment is the place of delivery."  Bumbo contends that Wartburg unilaterally makes up the time frame in which it should have to pay. Its response highlights and concedes the significant problems that ultimately undermined the oral agreement:  Wartburg was underfinanced and could not pay for the goods it was ordering and its banks would not lend it money, so it sought to make Bumbo its financier.  Wartburg's response shows that it did not have sufficient cash flow to meet the 90-day deadline.  Just weeks before the cancellation of the agreement, Mark Buchanan again told Bumbo that it could not meet Bumbo's payment terms.  #107, Ex. K.  Bumbo's cancellation was justified and permissible under the UCC.

Bumbo also claimed that if it could not cancel the distribution agreement, it still had the right to terminate it upon reasonable notice.  Bumbo contends that it did provide reasonable notice and

---

[30] The Court disagrees.  The course of dealing instead was the parties' ongoing flexibility in varying the terms of payment and credit in response to significant need. The definition of "course of dealing" in the UCC does not require unchanging conduct.

a substitute agreement that would have allowed Wartburg to continue
its business without disruption and continue supplying products to
all but one of its customers[31]:  it explained that it gave Wartburg
the option to continue distributing Bumbo products in the United
states alongside a new distributor.   Wartburg merely argues that
this was not a substitute arrangement, apparently because it would
not have the exact same customers as before.   Bumbo responds that
by definition, a substitute agreement would not be the same sort of
arrangement that previously existed and that Wartburg's argument
would render the substitute agreement provision meaningless.

## Court's Decision

There are genuine issues of material fact regarding the
surviving counterclaim that preclude summary judgment.   The
threshold issue is what were the terms of the initial oral agreement
at the time of the issuance of the injunction, specifically was
there a term in the agreement requiring Wartburg to sell its Bumbo
products first to the big three retailers to satisfy their needs,
to the exclusion of Wartburg's other clients?  The dispute is one
of fact and credibility, a "he said/she said" situation, which the
Court cannot resolve on summary judgment. *Deville*, 567 F.3d at 164.

Attached to Bumbo's motion for injunctive relief is a

---

[31] Toys "R" Us and Babies "R" Us had merged.  Wartburg
judicially admitted that it sells Bumbo products to "thousands of
customers" in the United States.  First Amended Counterclaim ¶
30.

declaration (#3-1,¶ 7) from its financial manager Gerhard Wagenaar

stating,

> As Bumbo Intl.'s distributor for Wal-Mart, Toys "R" Us,
> and Babies "R" Us, three of its biggest retailers in the
> United States, Wartburg's primary responsibility was to
> ensure that the inventory needs of these three retailers
> were being met.  This was a material term of th parties'
> agreement; it was the reason why Wartburg was being
> allowed to distribute the products to these important
> retailers and being sold products on credit.   Having
> these three major retailers' inventory needs met in a
> timely manner is a material requirement of the
> distributorship agreement between Wartburg and Bumbo
> Intl.

Also attached to the motion is a declaration (#3-2, ¶ 5) from

Bumbo's General Manager for International Sales, Christo Wagenaar,

who stated,

> Over the past several months, Warburg has placed orders
> with Bumbo Intl. in accordance with its projections for
> goods that are to be distributed to Bumbo Intl's
> retailers.   The vast majority of these products were
> ordered for and intended to be distributed to the three
> biggest retailers Wartburg handles for Bumbo
> international, i.e., Wal-Mart, Toys "R" Us, and Babies
> "R" Us.

Under Federal Rule of Civil Procedure 56(c)(1)(A), answers to

interrogatories are competent summary judgment proof.[32]  Wartburg,

---

[32] Contention interrogatories which seek information about
the factual bases underlying the claims and contentions of an
adverse party, are expressly authorized under Local Rule 33.3 'if
they are a more practical method of obtaining the information
sought than a request for a production of documents." *Tribune
Company v. Purcigliotti*, No. 93 Civ. 7222(LAP)(THK), 1997 WL
540810, at *1 (S.D.N.Y. Sept. 3, 1997). Here there are no written
documents memorializing the parties' oral agreement.  *See also
Convergent Business Systems, Inc. v. Diamond Reporting, Inc.*, No.
CV-88-2239 (ILG), 1989 WL 92038, at *1 (E.D.N.Y. Aug. 3,
1980)(""Seeking facts . . . which support a particular allegation

in response to Interrogatory No. 1, "If you contend that Defendant breached an agreement and/or contract with Plaintiff, please describe with particularity, the terms of such contract . . .' Wartburg, describing its distribution agreement with Bumbo, responded,

> Wartburg was free to sell these products to whoever ordered them from Wartburg. . . . Wartburg had an agreement with Bumbo whereby it bought baby products directly from Bumbo and then sold those products to whomever it chose through its own marketing efforts. Bumbo was only restricted from selling Bumbo products to certain retailers, daycare centers and medical organizations, at the very beginning of its relationship with Bumbo in approximately 2003.

#120-31 at p. 3.  In  addition, in Wartburg's opposition to Bumbo's motion for injunctive relieve, Wartburg submitted an affidavit from Mark Buchanan (#4-1 at p.2), which averred,

> Once its products are shipped to Wartburg (FOB South Africa) Bumbo International has no control over these products and Wartburg controls all aspects of distribution and allocation among retailers. Warburg has no contractual obligation to Bumbo International to deliver any particular products or shipments to any particular customer of Wartburg.

> Another genuine issue of material fact is which party canceled or terminated the agreement first:  Bumbo by its February 3, 2010

---

in a complaint violates neither the attorney-client or work product privileges . . . . Information in a complaint is not a substitute for answers to interrogatories, which unlike the allegations of a complaint can be used as affirmative evidence and trial and for impeachment and cross-examination purposes."), citing D.B. King v. E.F. Hutton & Co., 117 F.R.D. 2, 6 (D.D.C. 1987).  "The primary purpose of contention interrogatories . . .is to narrow the issues for trial. Linde v. Arab Bank, PLC, No. CV-0402799, at *1 (E.D.N.Y. Mar. 21, 2012).

email or Wartburg in refusing Bumbo's demand to pay timely and provide assurance of security, or subsequently in rejecting the February 3, 2010 email's offer of an "alternate" opportunity? Furthermore if Bumbo's February 3, 2010 email did terminate the agreement, was the two-day notice reasonable?

For the reasons stated above, the Court

ORDERS that Bumbo's second motion for summary judgment (#152) is DENIED. Furthermore, because, as discussed, there are genuine issues of material fact regarding whether under the oral distribution agreement Wartburg was free to distribute the Bumbo products to whichever client it chose around the time the preliminary injunction issued, as well as who canceled or terminated the agreement, when and how, *inter alia* discussed in this Opinion and Order, the Court

ORDERS that Bumbo's first motion for summary judgment is also DENIED. Finally, the Court

ORDERS that this case is REFERRED to United States Judge Frances Stacy to establish a new docket control schedule.

**SIGNED** at Houston, Texas, this  30th  day of  September , 2015.

_____

MELINDA HARMON
UNITED STATES DISTRICT JUDGE

-66-